**Vashti KATEPOO and Tamara Katepoo, by their guardian ad litem, Barbara GITTLER, Plaintiffs,**

v.

**The NEW YORK HOSPITAL, the Society of the New York Hospital, New York Hospital-Cornell Medical Center Fund, Inc., Payne Whitney Psychiatric Clinic, Richard H. Brent, Frank Miller, James E. Nininger, Donna Manning, Pamela Ingber and Samuel Pauker, Defendants.**

**No. 83 CIV 2008 (LBS).**

United States District Court, S.D. New York.

May 6, 1983.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for plaintiffs; Morris B. Abram, Gerald D. Stern, Diane Englander, New York City, of counsel.

Martin, Clearwater & Bell, New York City, for defendants; Francis P. Bensel, New York City, of counsel.

OPINION

SAND, District Judge.

Plaintiff in this malpractice action has, by order of the Supreme Court of New York, dated February 23, 1983, been ap-

pointed guardian ad litem of her stepdaughter Vashti Katepoo ("Vashti").[1] Plaintiff describes Vashti as being "severely brain damaged and utterly dependent." (Gittler Affidavit ¶ 1). Vashti is presently a patient at the Payne Whitney Psychiatric Clinic, The New York Hospital ("Payne Whitney"), and plaintiff seeks by order to show cause brought under Rules 65(a) and 17(c) of the F.R.Civ.P. to compel "(1) . . . defendants to restore to plaintiff Vashti Katepoo twenty-four-hour-a-day registered nursing care or, in the alternative (2) requiring defendants to contribute toward payment by plaintiff's representatives for such twenty-four-hour-a-day registered nursing care an amount equal to the cost of the companion care defendants concede to be medically necessary". Order to Show Cause, April 12, 1983. For the reasons set forth herein, the application is denied.

## FACTS

According to the affidavit of the plaintiff in support of the motion, Vashti and her daughter are citizens of Hawaii. On June 10, 1982, Vashti was admitted to Payne Whitney because she was suicidal and had tried to commit suicide that morning. On June 12, 1982, Vashti was found hanging from her own shoelace in her hospital room. Plaintiff asserts that, despite assurances furnished by defendants at the time of Vashti's admission and the following day that Vashti would be under constant observation for at least 72 hours and that "the level of observation would not be changed without my being notified", the defendants had changed the level of supervision from "maximum (constant)" to "frequent" observation and Vashti had been left unattended when she attempted suicide by hanging. (Gittler Affidavit ¶ 8).

Since June 12, 1982, Vashti has been in a coma, brain damaged, fed through a tube surgically inserted through the wall of her stomach, incapable of speech, but, "nonetheless, aware, emotionally suffering, and in great physical pain." (Gittler Affidavit ¶¶ 9, 10).

It appears that following this tragic occurrence, the hospital agreed voluntarily to render medical care and treatment to Vashti, who remains at Payne Whitney. Vashti then came under the care of Dr. Frank A. Petito, a Diplomate of the American Board of Psychiatry and Neurology in the specialty of Neurology and an attending neurologist on the staff of The New York Hospital. (Petito Affidavit ¶ 1). Dr. Petito attests that on or about June 14, 1982, he was asked by the Chief of Neurology to act as the private attending neurologist for Vashti and that, after consultation with Vashti's stepmother and guardian, *i.e.*, plaintiff, she consented to this relationship which continues to date (Petito Affidavit ¶ 2). From that time in June 1982 through January 1983, Vashti received twenty-four-hour, one-to-one nursing care, furnished at hospital expense.

According to Dr. Petito, in January 1983, he discussed with plaintiff discontinuance of this level of nursing supervision and transfer of Vashti to a semi-private room on a neurological floor with other neurological patients and a constant companion. Dr. Petito goes on to assert:

> Thereafter it was planned that the care and monitoring would be reevaluated. Those options to be considered at the time would include a constant companion; a return to one to one, twenty-four hour nursing care; and management by regular floor nursing care while in a semi-private room.

> Barbara Gittler rejected the proposal regarding transfer to a semi-private room with a companion and has elected to provide one to one, twenty-four hour-a-day nursing care for Vashti at her expense.

Petito Affidavit ¶ 3.

When the order to show cause was first returnable, it was not the subject of supporting or opposing affidavits by physicians. The sole affidavit before the Court,

---

1. Plaintiff is also guardian of Vashti's five-year old daughter pursuant to a separate order of the Supreme Court of New York.

furnished by The New York Hospital, was that of an administrator of the hospital asserting that the decision regarding the intensity of nursing care required by the patient was, in the first instance, that of her private attending physician. The affidavit continued:

It must be emphasized that the decision to afford Vashti one-to-one, twenty-four-hour-a-day nursing care was Dr. Frank Petito's. This decision was made when Vashti was moved from the Intensive Care Unit to a medical floor under Dr. Petito's care in the Summer of 1982. In January of 1983, it was Dr. Petito's medical judgment that one-to-one, twenty-four-hour-a-day nursing care was no longer medically necessary for Vashti. In fact, the possibility of changing Vashti's one-to-one, twenty-four-hour-a-day nursing care to companion care was discussed at a meeting attended by myself, Dr. Frank Petito, Barbara Gittler, and her husband Steven Lemberg in November of 1982.

Affidavit of Anne Cote, ¶ 7.

This Court inquired at oral argument whether there was any reason why Dr. Petito's recommendations were presented in this second-hand fashion. We were assured that there was no problem in furnishing an affidavit from Dr. Petito. We further stated that if such an affidavit were furnished that the burden would be on the plaintiff to make some showing that competent medical opinion—as distinguished from plaintiff's lay subjective views—supported the application. We stated that we recognized that the proceeding presented numerous troublesome questions but that we would reach none of them absent some expert medical support for plaintiff's application.

Thereafter, there was filed with the Court the affidavit of Dr. Petito, dated April 20, 1983, paragraph 4 of which reads:

In my opinion the medical care rendered to Vashti Katepoo has been excellent. At the present time there is no medical necessity for one to one, twenty-four hour nursing care. The management of Vashti's care by means of regular floor care in a semi-private room with one person constantly observing the patients therein would constitute reasonable care at the present time.

On April 27, plaintiff filed the affidavit of Dr. Marvin Linick, who describes himself as the family physician for plaintiff's family. Dr. Linick states that he first saw Vashti on June 10, 1982, when she was brought to his office after she had tried to kill herself that morning. He has visited Vashti at the hospital and has read Dr. Petito's affidavit. He states that he disagrees with Dr. Petito's

conclusory statement that Vashti does not need round-the-clock *nursing care,* and could be left in a semi-private room with one companion tending the several patients in that room. It is my opinion that round-the-clock nursing care for Vashti is medically indicated.

Linick Affidavit ¶ 5.

## DISCUSSION

The underlying case is before this Court as a malpractice action in which federal jurisdiction is predicated on diversity. Plaintiff's counsel readily agreed at oral argument that the complaint rests on a single discrete act of alleged malpractice—*i.e.,* the failure to observe Vashti on June 12, 1983.[2] But plaintiff asserts Fed.F.R. Civ.P. 17(c) provides that where dealing with an incompetent, a court "shall make such other order as it deems proper for the protection of the . . . incompetent person." We believe, however, that plaintiff reads too much into this rule which is designed to insure that an incompetent's rights could be asserted in court, not to confer broad substantive rights upon an incompetent.

2. Plaintiff contends that it is of little moment whether the claim to nursing care asserted herein arises out of the original tort or constitutes a separate claim. If the latter, a new complaint could be filed based on diversity and plaintiff could move to consolidate the actions. For the reasons set forth below, we conclude however that such a complaint would fail to state a valid cause of action.

The relief which plaintiff seeks is unique and has far reaching implications. It is an unusual circumstance for an alleged malpractice victim to continue in the care of the facility alleged to have committed the malpractice which is providing such ongoing care gratuitously. We are concerned with the implications of imposing upon a hospital which voluntarily agrees to render service enforceable obligations which it did not agree to undertake and which it believes are inappropriate. We are also hesitant, absent compelling circumstances, to undertake the oversight by a federal court of the adequacy of medical care being voluntarily rendered to a patient who has been declared a ward of the state and who has ready access to the state courts pursuant to the Public Health Law Section 2800 *et seq.* to challenge the adequacy of ongoing medical care.

In order for plaintiff to establish her right to the injunctive relief which she seeks (or even to an evidentiary hearing on her claim for such relief), it must appear that some duty is owed by defendant to plaintiff which is being violated. Here, the hospital emphasizes that Vashti is a private patient whose medical care is being supervised by a private attending physician. Plaintiff does not contest Payne Whitney's assertion that the only services which it has agreed to furnish gratuitously are those services which the attending physician shall prescribe as necessary.

Plaintiff is free to pursue any number of theoretically possible alternatives.[3] These include discharge and replacement of Dr. Petito, who has opined that the hospital's proposed actions are medically sound, or removal of the patient to some other facility entirely (there being no allegation that the patient could not be moved). Plaintiff cannot fail to exercise these options and, at the same time, assert that there will be irreparable injury unless the Court compels the hospital to render greater care than the attending physician deems necessary.

We need not scrutinize too closely the hospital's motives for making this offer. The malpractice case has yet to be tried (indeed, the complaint is dated as recently as March 15, 1983) and responsibility for the tragedy has yet to be determined. The hospital might well have opted to sever as soon as possible what must be a difficult and emotional relationship. One should not lightly impose upon the hospital obligations with respect to future care greater than those it volunteered to assume and run the risk of deterring such benevolence in the future.

In sum, we conclude that plaintiff has failed to show that defendants threaten to breach some duty owed to plaintiff which breach, if not prevented by the Court, would cause plaintiff irreparable injury.

Of course, one in plaintiff's position would prefer to have one-on-one twenty-four hour nursing care. No one disputes that all considerations of cost and manpower aside, more care is preferable to less care. But on the facts before me, I see no basis for the grant either of the injunctive relief or the award of monetary relief in the amount of the cost of companion care which plaintiff has rejected in favor of the privately paid nursing care.[4]

The application for injunctive relief is hereby denied.

SO ORDERED.

---

**3.** We categorize these options as theoretic because we recognize that the hospital's gratuitous undertaking to render treatment and care to Vashti at a level deemed appropriate by the attending physician cannot, for economic and other reasons, readily be cast aside.

**4.** The hospital has asserted that, apart from other objections, it cannot readily determine how to allocate such costs, *e.g.,* where volunteers are utilized, or when one companion services several patients.